UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| ARTHUR H. MEYERS, JR.<br>and LENA MEYERS | CIVIL ACTION |
| versus | NO.  05-4135 |
| THE PROCTOR & GAMBLE COMPANY,<br>THE PROCTOR & GAMBLE DISABILITY<br>PLAN and JOHN DOE | SECTION: E/5 |

## RULING ON CROSS MOTIONS FOR SUMMARY JUDGMENT

This matter is before the Court on cross motions for summary judgment.  Defendant, the Proctor & Gamble Disability Plan[1] (the "Plan"), filed its motion for summary judgment on June 11, 2007 (r.d. #37); plaintiffs Arthur and Lena Meyers ("Meyers") filed a cross motion for summary judgment on July 7, 2007 (r.d. #45).  After consideration of the briefs, the Administrative Record, and the law, and for the reasons that follow, the Plan's motion for summary judgment is GRANTED, and Meyers' motion for summary judgment is DENIED.

## BACKGROUND

The following facts are undisputed. Arthur Meyers was an employee of Proctor & Gamble Company (at Folger Coffee) from 1979 until November 9, 2004.  In 1997 he developed problems with his legs, eventually including cellulitis, leg ulcers, chronic venous insufficiency, varicose veins and dermatitis in his legs.  Meyers applied for and was approved for total disability benefits through the Plan as a result of his inability to perform any physical tasks.  He eventually reached maximum medical improvement of his physical condition, but was diagnosed by a psychiatrist as being totally disabled as a result of his major depression.  Administrative

---

[1]The Plan is the only defendant remaining in the lawsuit.

Record ("AR"), Bates Nos. ("Bates") 000055-58, 000073-76, 000083-94 and 000099-000100.[2]

In November of 2000, Meyers' depression became the sole basis of his continuing receipt of total disability benefits under the Plan.  In August 2003, Meyers participated in an Independent Medical Examination ("IME") at the request of the Plan, to determine whether his medical condition was such that he continued to be eligible to receive total disability benefits.  During the IME, Meyers provided to Dr. Ross A. Gallo information regarding his limited social interactions and physical activity that supported his diagnosis of totally disability due to major depression.  Based on Dr. Gallo's diagnosis, his long term disability benefits were continued under the Plan.

Shortly after the IME, the onsite Health Services Coordinator for the Plan received information that Meyers was working at a local diner.  Declaration of Michelle Oulliber ("Oulliber Decl.") ¶¶ 4-5, Exhibit 2 to Proctor & Gamble Memo.  The Plan investigated the report by conducting surveillance of Meyers' activities.  Meyers was observed at the diner, where his wife worked, for hours at a time socializing with others, doing odd jobs for the diner, working on his car, and giving a co-worker a ride home.  A investigative interview with Meyers was then conducted.  Meyers admitted that he spent an average of 20-25 hours a week at the diner and regularly socializes with co-workers in the back and customers up front, and that he helped with the diner's catering services and performed odd jobs around the diner.  The Plan notified Meyers by letter, dated March 23, 2004, from Mr. Dean Wunderle, chairperson of the

---

[2]The Administrative Record is Exhibit 1B to the Declaration of Curt Hoffman, chairperson of the Board of Trustees of the Procter & Gamble Disability Benefit Plan and the Long Term Disability Benefit Plan (collectively referred to as "the Plan").  Hoffman's Declaration, pages 1-5, is attached to the AR, but is not included in the Bates page numbers.  It is also filed as Exhibit 1 to Proctor & Gamble's Memorandum in Support ("Proctor & Gamble Memo") of its motion for summary judgment.  The Administrative Record is filed under seal, by order of the court,  to protect Meyers' confidential information.

New Orleans Reviewing Board, of the decision to terminate his disability benefits because (1) he was determined to be no longer totally disabled under the Plan; and (2) these social interactions and physical activities that were observed and to which he admitted were different from the purported lack of social interaction and physical activity that he described during his IME. AR Bates 22-23. By letter dated May 20, 2004, from Rick Tonry, Meyers' attorney, Meyers appealed the decision. AR Bates 17-19. By letter to Mr. Tonry dated July 9, 2004, from Curt Hoffman, chairperson of the Board of Trustees of the Plan, Meyers' appeal was denied. AR Bates 1-2. When Meyers failed to return to work, his employment was terminated on November 9, 2004.

Meyers ultimately filed this suit in state court against the defendants alleging wrongful termination (Petition for Damages, ¶ X), civil conspiracy and breach of contract (¶¶ VII, IX), loss of consortium and emotional distress (¶¶ XI, XII). Proctor & Gamble removed the suit to federal court based on federal question jurisdiction. These cross motions for summary judgment followed.

## ANALYSIS

A motion for summary judgment is properly granted only if there is no genuine issue as to any material fact, and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L. Ed. 3d 265 (1986). An issue is material if its resolution could affect the outcome of the action. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). In deciding whether a fact issue has been created, we must view the facts and the inferences to be drawn therefrom in the light most favorable to the nonmoving party. See Olabisiomotosho v. City of Houston, 185

F.3d 521, 525 (5th Cir. 1999).  However, once a moving party properly supports a motion for summary judgment, the nonmoving party "must go beyond the pleadings and designate specific facts in the record showing that there is a genuine issue for trial."  Lawrence v. Univ. of Tex. Med. Branch at Galveston, 163 F.3d 309, 311-12 (5th Cir. 1999), *quoting* Wallace v. Texas Tech. Univ., 80 F.3d 1042, 1047-48 (5th Cir. 1996).  The nonmoving party cannot satisfy its burden with "unsubstantiated assertions" or "conclusory allegations."  Id.  If the opposing party bears the burden of proof at trial, the moving party need not submit evidentiary documents to properly support its motion, but need only point out the absence of evidence supporting the essential elements of the opposing party's case.  Saunders v. Michelin Tire Corp., 942 F.2d 299, 301 (5th Cir. 1999).

*State Law Claims*

Although this lawsuit was filed in state court alleging state law claims, there is no dispute that the Plan at issue is governed by ERISA, 29 U.S.C. § 1132 *et seq.*.  Generally,  state law claims are preempted by ERISA when a plaintiff's claims are predicated on the denial of benefits under and ERISA plan.  29 U.S.C. § 1144(a)[3].  Meyers' employer was dismissed from the lawsuit by Order of the Court on February 20, 2007. R.d. # 20.  It is undisputed that he was not employed by the Plan, the only remaining defendant.  Meyers, claim for wrongful termination fails.  Meyers' state law contract claim and tort claims for civil conspiracy, loss of consortium, and emotional distress are preempted by ERISA.  *See* Mayeaux v. Louisiana Health Service and

---

[3]Neither Meyers' motion for summary judgment nor his opposition to Proctor & Gamble's motion for summary judgment address these state law claims. Failure to brief and argue an issue is grounds for finding that the issue has been abandoned. Fehlhaber v. Fehlhaber, 681 F.2d 1015, 1030 (5th Cir. Unit "B" 1980).

Indemnity Company, 376 F.3d 420, 430 (5th Cir. 2004)(affirming district court's holding that various state law tort claims are preempted by ERISA); Dubos v. Wal-Mart Stores, Inc., 2005 WL 1801977, *1 (W.D.La. 2005).

*ERISA Standards of Review*

A denial of benefits challenged under the provisions of ERISA must be reviewed under a *de novo* standard unless the benefit plan gives the plan administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the plan, in which case the standard of review is abuse of discretion. Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 105, 109 S.Ct. 948 (1989). It is undisputed that the policy at issue vests the Plan with the discretionary authority to determine eligibility for benefits and to interpret the terms and provisions of its policy in making benefit determinations, therefore the court will review the Plan's denial of Meyers' claim for abuse of discretion.

The scope of the district court's review in assessing the Plan's factual determination to deny benefits is limited to a review of the administrative record. Vega v. National Life Insurance Services, 188 F.3d 287, 299 (5th Cir. 1999). "The administrative record consists of relevant information made available to the administrator prior to the complainant's filing of a lawsuit and in a manner that gives the administrator a fair opportunity to consider it." Id., at 300; Estate of Bratton v. Nat'l Union Fire Ins., 215 F.3d 516, 521 (5th Cir. 2000). Therefore:

> a district court must inquire only whether the "record adequately supports the administrator's decision"; from that inquiry it can conclude that the administrator abused its discretion if the administrator denied the claim "without some concrete evidence in the administrative record."

Gooden v. Provident Life & Accident Ins. Co., 250 F.3d 329, 333 (5th Cir. 2001).

The decision whether a plan beneficiary is disabled as defined by an ERISA plan is a factual determination subject to judicial review under an arbitrary and capricious standard. Sweatman v. Commercial Union Ins. Co., 39 F.3d 594, 601 (5th Cir. 1994);  Bass v. Metropolitan Life Ins. Co., 1995 WL 581761 (E.D.La.).  Factual determinations made by an administrator should be rejected only upon a showing of an abuse of discretion, that is, if shown to be arbitrary and capricious.  Pierre v. Connecticut General Life Insurance Co., 932, F.2d 1552, 1562 (5th Cir. 1991).  A decision is arbitrary when it is made without rational connection between the known facts and the decision or between the found facts and the evidence.  Lain v. Union Life, 279 F.3d 337, 346 (5th Cir. 2002).  However, a decision of a plan administrator or fiduciary should not be overturned if the decision is supported by substantial evidence.  Wildbur v. Arco Chemical Co., 974 F.2d 631, 637 (5th Cir. 1992)(citations omitted), *reaff'd by* Medtrust fin. Serv. Corp. v. The Sterling Chemicals, Inc., 168 F.3d 211, 215 (5th Cir. 1999).  Substantial evidence is "such evidence that a reasonable mind might accept as adequate to support the conclusion rendered by the decision maker.  Substantial evidence requires more than a scintilla, but less than a preponderance." Ellis v. Liberty Life Ins. Co. Of Boston, 394 F.3d 262, 273 (5th Cir. 2005).

Meyers argues that the Plan has a conflict of interest because it is both the insurer and the ERISA fiduciary/administrator, therefore its decision to terminate his benefits is entitled to less deference.  He argues that there is no concrete evidence in the Administrative Record to support its decision, therefore the decision is an abuse of discretion. The Fifth Circuit has recognized that some modification of the abuse of discretion standard may be required in such a situation where the insurer could potentially benefit from the denial of a claim.  Vega, 188 F.3d at 295.

However, the Fifth Circuit does not recognize the *presumption* that such a conflict exist, and requires that an "ERISA plaintiff must come forward with evidence that a conflict exists - and that any reduction in the degree of our deference depends on such evidence - ...." Ellis, 394 F.3d at 270 n.18, *citing* MacLachlan v. ExxonMobil Corp., 350 F.3d 472, 479 n.8 (5th Cir. 2003).  The degree to which a court must abrogate its deference to the determination of a plan fiduciary will depend on the nature and extent of the fiduciary's conflict, with less deference to be granted when there is greater evidence of a conflict.  Id.

Several circumstances can be indicative of a conflict.  For example, where, in the exercise of its discretion in processing a claim, one interpretation will further the financial interests of the fiduciary, the court should review the interpretation to determine whether it is consistent with the exercise of discretion by a fiduciary acting free of interests that conflict with those of the beneficiary.  Vega, 188 F.3d at 295.   A conflict of interest is also shown if the plan administrator provides inconsistent reasons for denial of a claim.  Lang v. Long-Term Disability Plan of Sponsor Applied Remote Tech, 125 F.3d 794, 797 (9th Cir. 1997).   Other than his argument that no concrete evidence supports the Plan's termination of his benefits, Meyers offers no evidence that a conflict of interest within the Plan affected its decision to terminate his benefits.  The Court  need not  modify of the abuse of discretion standard for its review of the Plan's actions.

### *Abuse of Discretion Analysis*

In the Fifth Circuit, application of the abuse of discretion standard may involve the following two steps: (1) determine the legally correct interpretation of the plan; and (2) if the administrator did not give the plan the legally correct interpretation, the court must then

determine whether the administrator's decision was an abuse of discretion. Wildbur, 974 F.2d at 637-638. Answering the first question requires consideration of (1) whether the administrator has given the plan a uniform construction; (2) whether the interpretation is consistent with a fair reading of the plan; and (3) any unanticipated costs resulting from different interpretations of the plan. Id. at 638. "Only if the court determines that the administrator did not give the plan the legally incorrect interpretation, must the court then determine whether the administrator's decision was an abuse of discretion." Id.

*Did the Administrator give the Legally Correct Interpretation of the Plan Documents?*

The Plan document[4] at issue, at Article II, Section 16, defines "Total Disability" as follows:

> "Total Disability" means a mental or physical condition resulting from an illness or injury which is generally considered totally disabling by the medical profession. Usually, Total Disability involves a condition of such severity as to require care in a hospital or restriction to the immediate confines of the home.

At Article IX - General Provisions, the Plan document also provides in part:

> 4. The Trustees reserve the right to terminate participation in the Plan and the payment of benefits under the Plan for any Participant who knowingly gives false or incorrect information as to physical fitness, or when he or she applies for participation or for the payment of benefits. The Trustees have the sole right to decide whether a cancellation of participation is warranted, or whether

---

[4] A copy of the Plan itself is not included in the AR. However, the only relevant provisions of the Plan are quoted in both the letter dated July 9, 2004, from Curt Hoffman to Mr. Tonry, Meyers' attorney, denying Meyers' appeal of the decision of the New Orleans Reviewing Board terminating Meyers' benefits (AR Bates 1-2), and in the letter dated March 23, 2004, from Mr. Dean Wunderle, chairperson of the New Orleans Reviewing Board, initially notifying Meyers of the decision to terminate his benefits (AR Bates 22-23). A copy of "The Proctor & Gamble Disability Benefit Plan" is included in Proctor & Gamble's Memo, Ex. 1A to Hoffman Decl., Ex. 1. The Court takes judicial notice of the Plan document, and reviewed the document only to confirm the accuracy of the relevant portions quoted in the letters that are in the AR.

participation can be continued on a limited basis.

Addressing the first of the <u>Wildbur</u> factors, the Court is unable to determine whether the administrator has given the plan a uniform construction because there is nothing in the Administrative Record to allow the Court to compare the administrator's evaluation of Meyers' claim with its evaluation of other similar claims.  Neither is there anything in the Administrative Record to allow the Court to address the third <u>Wildbur</u> factor, whether there may be any unanticipated costs resulting from different interpretations of the plan.  Meyers did not argue or produce any documents regarding whether a different determination of the continuation of disability benefits under the Plan would have any consequences or effect, unanticipated or otherwise, on the Plan.  There is sufficient evidence in the Administrative Record to address the second <u>Wildbur</u> factor, determining whether the interpretation is consistent with a fair reading of the plan.

On August 7, 2003, at the request of the Plan and pursuant to its provisions, Meyers participated in an IME by Dr. Ross Gallo.  AR Bates 00055-00058.  Dr. Gallo had  previously examined Meyers on behalf of the Plan in 2001 and 2002.  AR Bates 00030, 00073-76.  His written  "Psychiatric Evaluation" prepared on behalf of the Plan included the following observations:

> ... Mr. Meyers also reports that he gets agitated around people.
> This occurs mostly around family members, because these are the
> only people he comes in contact with.  He yells at family members
> for no reason.  He just wants to be left alone.  He locks himself in
> his room to get away from his children and his grandchildren.
> ....
>
> ... Mr. Meyers stated that his wife is no longer able to work
> secondary to severe arthritis.  The couple does not socialize.  Mr.
> Meyers stated that his friends still work, so he is forced to spend

-9-

> most of his waking hours with limited interpersonal contact.  Mr.
> Meyers then went on to say, "I have one friend and a lot of
> acquaintances."
>
> Mr. Meyers used to spend some time helping out at a diner
> where his wife used to work.  He did not get paid for his services.
> He rarely goes there now.  He does not stay if there are other
> people in the diner.  He may stay if there is one other person there.
> He goes there to feel useful, but states, "It doesn't work."

AR Bates 00055-00057.  Dr. Gallo's "Diagnostic Impression" included the statement  "Stressors include disability, *social isolation*, marital discord, Family discord, and financial stress."  (AR Bates 00058) (emphasis supplied).  His "Recommendations" stated "I find that Mr. Meyers clearly fits the criteria for Severe Major Depression.  He is totally disabled on this basis of this depression and is unable to perform work of any type."  Id.

Michelle (Shelli) Oulliber is the onsite Health Services Coordinator for the Local Review Board of the Plan, as well as Meyers' case manager for the Plan.  Proctor & Gamble Memo, Ex. 2, Oulliber Declaration; AR Bates 00004.  In mid November 2003,  Oulliber was informed by her step daughter that she had met Mr. Meyers at the Par 3 Diner where she worked, and that he worked doing odd jobs along with food preparation every week-end at the diner.  She said that he informed her that he is "retired" from Folger Coffee.  Oulliber Decl.; AR Bates 00004, 00012 .  Pursuant to this information, the Plan initiated surveillance of Meyers' activities.  Id.

Surveillance was conducted in December 2003 on the 11th, 12th, 13th, and 16th, and in January 2004 on the 15th, 16th, 17th and 19th.  AR Bates 000031-000052.  On December 12, 2003, Meyers was first observed outside of the diner at 8:53 a.m.  During that day, he was seen (and video taped) driving a co-worker home, working on his truck in the parking area behind the diner, talking with a female co-worker, exiting the diner carrying several five gallon buckets, and

after re-entering, cleaning inside the diner with two co-workers. He left the diner at 3:40 p.m. He was not seen at the diner on the 11th, 13th or 16th of December. On January 15, 2004, Meyers was observed in the diner for a brief period of time. He left the diner at 8:30 a.m. and returned to his residence. Later that day, he was observed working on a car parked in his carport for nearly two hours. On January 16th, Meyers' pick-up truck was first observed parked near the rear service entrance of the diner at 5:00 a.m. He was observed at 6:25 a.m. when he exited the diner and smoked a cigaret in the rear parking area. During the morning he was observed and video taped carrying trash bags to the dumpster in the rear of the diner, carrying boxes to and from the rear of the diner and parked vehicles, talking with co-workers and carrying mops, until 4:56 p.m. when he left the diner and returned to his home, after at least 12 hours at the diner. On January 17th, Meyers' pick-up truck was again observed parked near the rear service entrance of the diner at 5:00 a.m. On two occasions he was observed throwing trash into the dumpster near the rear entrance of the diner. He left the diner in truck at 7:52 a.m. and returned to his home. On January 19th, Meyers' truck was observed parked at the diner at 7:07 a.m. He was seen throwing trash into the dumpster at 8:20 a.m., after which he swept and scraped the sidewalk for a short while. At 8:24 a.m. he re-entered the diner. Surveillance was discontinued at 9:00 a.m. when he had not left the diner by that time.

      Meyers was called in for a "Fact Finding Discussion" attended by Alison Slaney, Shelli Oulliber-Areas, and Walter Washington, representing the Plan. Shelli Oulliber's typed notes from the February 12, 2004, discussion are at AR Bates 000026-29. During the discussion, Meyers stated that after he was on total disability for two years he started working for short periods of time at the diner where his wife worked because he got depressed when he stayed in

the house, and that he would stay at the diner until he "got aggravated" or his legs started to hurt. He acknowledged that he helped out with the catering, made finger sandwiches, checked inventory, waited for deliveries, and occasionally mopped. He denied being paid, but did state that he received free meals. He also acknowledged that he spent about 20-25 hours a week at the diner, usually a maximum of 8 hours at a time, and that he spent time drinking coffee with other workers in the back and sometimes with a customer in the front. AR Bates 000026-000027.

Curt Hoffman's letter affirming the Plan's termination of Meyers' disability benefits explains the decision as follows:

> Mr. Meyers has received benefit payments from the Plan as a totally disabled participant since September 3, 1997. Mr. Meyers was out of work originally for various physical diagnoses. Although an Independent Medical Examination in November of 2000 indicated that Mr. Meyers was at maximum medical improvement with regard to his physical disabilities, he continued to receive benefits from the Plan as a totally disabled participant due to a diagnosis of major depression.
>
> In November of 2003, the Local Reviewing Board received information that Mr. Meyers was working at the Par 3 Diner. Based on this information surveillance was conducted of Mr. Meyers at the diner over several days in December of 2003, and January of 2004. On four separate occasions during the period of surveillance, Mr. Meyers was observed at the diner by 5:00 AM in the morning. Mr. Meyers remained at the diner for 12 hours on one day, and over 20 hours over one three day period. During this time Mr. Meyers was observed cleaning inside the diner, mopping, sweeping, scraping the sidewalk out side the diner, emptying trash from the diner and conversing frequently with other employees at the diner.
>
> On February 12, 2004, a meeting was held with Mr. Meyers to discuss his activities as they relate to his disability status. At that meeting Mr. Meyers confirmed that he averaged 20 to 25 hours per week at the diner helping out. Mr. Meyers stated he was not paid, but confirmed his activities included helping out with catering, making sandwiches, checking inventory, waiting on

> deliveries, and mopping and sweeping.
>
> During Mr. Meyers most recent Independent Medical Examination on August 8, 2003, Dr. Gallo notes that Mr. Meyers reports that he used to help out at the diner where his wife works, but he rarely goes there now and does not stay if there are other people in the diner. This information, provided to the reviewing physician to determine his continuing disability status, is directly contradicted by the surveillance observations, and by Mr. Meyers on admission on February 12, 2004, when he stated that he spends an average of 20 to 25 hours per week at the diner helping out.
>
> ....
>
> The Trustees have reviewed all of the information provided to the Trustees in support of the claim for Total Disability. Although you have appealed the benefit denial determination, the Trustees have concluded, based on the surveillance observations and based on the interview with Mr. Meyers on February 12, 2004, that Mr. Meyers' level of activity is not consistent with the definition of total disability as defined by the Plan and interpreted by the Trustees. In addition, he provided incorrect information to the Plan as to his physical fitness. Each reason alone is sufficient for the denial of his benefits. Consequently, your appeal on behalf of Mr. Meyers is denied.

AR Bates 1-2.

The Court finds that the Plan administrators gave the legally correct interpretation to the Plan by terminating his disability benefit payments, when, based on the results of the surveillance of Meyers' activities and the interview with Meyers, they found that he was no longer totally disabled under the terms of the Plan, and that he had provided inaccurate and misleading information to Dr. Gallo during the IME in August, 2003.

*Is the Administrators' Decision and Abuse of Discretion?*

Pursuant to the Wildbur factors, the Court need not proceed to the determination of whether the administrator's decision was an abuse of discretion.   Wildbur, 974 F.2d at 637-638.

However, in the interests of addressing all of Meyers' arguments, the Court continues the analysis.

Meyers argues in both his cross motion for summary judgment and in his opposition to Proctor & Gamble's motion for summary judgment that the administrators abused their discretion because there is no concrete evidence to support the Plan's decision.  He argues that both Dr. Thomas L. Keister, Jr., his treating psychiatrist, and Dr. Gallo, who examined Meyers on behalf of the Plan several times, repeatedly diagnosed severe major depression and declared that he is totally disabled.   He asserts that none of his doctors have released him from treatment, and no medical evidence has been shown to contradict the fact that he suffers from severe depression, and that the Plan administrators incorrectly ignored all of the medical evidence and opinions in the Administrative Record that he is both physically and mentally disabled.  Because the basis of his current receipt of total disability benefits is his diagnosis of severe major depression, the physicians' opinions regarding his physical disability are immaterial to the issue before the Court.

"A physician's opinion of disability 'premised to a large extent upon the claimant's own accounts of his symptoms and limitations' may be disregarded where those complaints have been 'properly discounted.'"  Morgan v. Comm'r of the Social Security Administration, 169 F.3d 595, 602 (9th Cir. 1999), *citing* Fair v. Bowen, 885 F.2d 597, 605 (9th Cir. 1989).  *See also* Nicula v. First UNUM Life Insurance Co., 23 Fed. Appx. 805,  807 (9th Cir. 2001)(surveillance video and report showing claimant feigned his physical disability constituted substantial evidence sufficient to justify less deference to the opinion of his treating physician.)  Both Dr. Keister and Dr. Gallo based their determination that Meyers is totally disabled at least in part on the

-14-

information he imparted to them regarding his social and interpersonal contacts, and his ability, or inability, to function for any period of time in social or work related situations.  When he was examined by Dr. Gallo in August 2003, we was not candid about the frequency and duration of his social interactions with others, or about the frequency and duration of his work at the diner. Based on the information from the surveillance and on Meyers' own admissions during the interview, the Plan had substantial evidence to discount the physicians' opinions and to support its decision that Meyers is not totally disabled under the terms of the Plan.

Meyers next cites to a number of Louisiana cases in support of his argument that under Louisiana law, the term "total disability" does not mean absolute helplessness on the part of the insured.  Eligibility for ERISA benefits is "governed in the first instance by the plain meaning of the plan language".  Threadgill v. Prudential Sec. Group, Inc., 145 F.3d 286, 292 (5th Cir. 1998), *citing* Nickel v. Estate of Estes, 122 F.3d 294, 298 (5th Cir. 1997).  In Thibodeaux v. Continental Casualty Insurance Company, 138 F.3d 593, 596 (5th Cir. 1998), as a matter of first impression, the Fifth Circuit held that state law governing insurance policy interpretation is preempted by ERISA, and  "the correct definition of 'total disability' is as stated in the plan."  Substantial evidence in the Administrative Record supports the administrators' decision that under the plain language of the Plan, Meyers is not totally disabled.   There was no abuse of discretion.

## CONCLUSION

The Court finds that there are no genuine issues of material fact in dispute, and Proctor & Gamble is entitled to summary judgment as a matter of law.


Accordingly,

**IT IS ORDERED** that Proctor & Gamble's motion for summary judgment is **GRANTED;** and

**IT IS FURTHER ORDERED** that Arthur and Lena Meyers' motion for summary judgment is **DENIED.**

New Orleans, Louisiana, November 20, 2007.

*/s/ Marcel Livaudais, Jr.*
**MARCEL LIVAUDAIS, JR.**
Senior United States District Judge